IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 1, 2012

## STATE OF TENNESSEE v. MONICA RANKIN

**Direct Appeal from the Circuit Court for Williamson County**
**No. ICR115323      Robbie Beal, Judge**

_____

**No. M2011-01849-CCA-R3-CD - Filed August 9, 2012**
_____

The Defendant, Monica Rankin, pled guilty to two counts of sexual battery by an authority figure, aggravated statutory rape,  exploitation of a minor by electronic means,  solicitation to commit aggravated statutory rape, and solicitation to commit sexual battery by an authority figure.   The trial court sentenced the Defendant as a Range I, standard offender, to an effective sentence of five years and ordered her to serve six months in confinement, followed by supervised probation.  On appeal, the Defendant argues that the trial court erred when it: (1) applied enhancement factors and failed to apply mitigating factors; (2) denied her full probation; and (3) denied her request for a variance from the probation rule prohibiting internet access for sex offenders.  Following our review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Venus Niner, Franklin, Tennessee, for the appellant, Monica Rankin.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel; Kim Helper, District Attorney General; and Mary Katherine White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

1

This case arises from the Defendant's sexual conduct with a fifteen-year old male victim.[1]  On November 8, 2010, a Williamson County grand jury indicted the Defendant for four counts of sexual battery by an authority figure, two counts of aggravated statutory rape, one count of solicitation to commit aggravated statutory rape, one count of solicitation to commit sexual battery by an authority figure, and one count of exploitation of a minor by electronic means.  The Defendant pled guilty to all of the counts in the indictment, reserving sentencing for the trial court.  The pre-sentence report[2] contained the following summary of the Defendant's offenses:

> According to information in the District Attorney's File, the [D]efendant volunteered for the People's Church as a youth group leader for a group of Middle School Girls.  The Group met for numerous engagements, including activities not organized by the church such as movie nights held at the homes of group members.  Some of the girls' male friends were also present at some of the events. [The Defendant] reportedly became very involved with the social aspects of the group, devoting a lot of time and money toward their activities and acting as a matchmaker on behalf of the boys and girls.  At one point, a parent of one of the males even complained because [the Defendant] had been texting late at night with his/her son (not the victim in this case) about a personal problem of his, and the pastor requested that [the Defendant] stop doing such.

> The victim in the instant case (male, DOB 5/28/94) reportedly expressed intimate feelings toward [the Defendant] and over time their interactions became sexual.  They exchanged sexual te[x]t messages and [the Defendant] sent the boy approximately ten picture messages of herself scantily clad or of her bare breasts or genitals.  On August 11, 2009, during a movie night at [the Defendant's] home, [the Defendant] and the victim sat on a couch masturbating one another beneath a blanket, unknown to a girl sitting on the end of the couch or to other group members in the room.  Another incident whereby the [D]efendant and victim manually manipulated each other's genitals on [the Defendant's] couch reportedly occurred in June 2009.

> The illicit relationship was revealed when [the Defendant's] husband's divorce lawyer alerted law enforcement that they had discovered [the Defendant's]

_____

[1]  To protect the identity of the minor victim, he will be referred to herein solely as "the victim."

[2]A transcript of the guilty plea submission hearing is not included in the record, thus, we rely upon the facts provided in the presentence investigation report.

2

sexual text messages to an underage boy on the family computer. [The Defendant's] IPhone had been synchronized with the computer and stored the messages in a file. (Ex. 1 at 5-6.)

At the sentencing hearing, the State offered into evidence the presentence report with several attachments that included a victim impact statement, a psycho-sexual evaluation, sex offender rules, and sex offender directives. The State also offered the testimony of Sergeant Eric Anderson, a Franklin Police Department officer, who testified that he served as the supervisor of the special victims unit, which investigated crimes involving families such as domestic violence, child abuse, elder abuse, and the sexual exploitation of minors.

Sergeant Anderson testified that he participated in investigating the Defendant. He explained that Steve Jackson, a local private investigator hired by the Defendant's former spouse during their divorce, filed a complaint against the Defendant. Sergeant Anderson learned that Jackson conducted some computer forensic work on the family computer that belonged to the Defendant's former husband. The Defendant's cellular phone electronically synced with the family computer, so Jackson was able to view text messages and electronic communications between the Defendant's cellular phone and other individuals, including the victim. Sergeant Anderson said that there were a "significant number" of ongoing text messages between the victim and the Defendant that "were graphically sexual in nature, solicitous in nature, and exploitive in nature."

Sergeant Anderson testified that, due to the nature of the text messages and their ongoing nature, he contacted the victim's parents and interviewed the minor child on August 18, 2009. During this interview, Sergeant Anderson learned that the victim was fifteen years old and that the victim knew the Defendant through his involvement at the People's Church. The victim explained to Sergeant Anderson that the Defendant was a leader of a girl's youth group at the church. Through various meetings and activities, such as events, "get-togethers," and movie nights at different homes or the church, the victim came to know the Defendant. The victim told Sergeant Anderson that he and the Defendant began to engage in text message communication regarding sexual matters and sexual conduct. The victim said that he received nude images of the Defendant via picture messages on his cellular phone. The most recent inappropriate text messages from the Defendant were received the night before Sergeant Anderson's interview with the victim.

Sergeant Anderson testified that the victim disclosed that fondling, genital manipulation, and skin-to-skin contact occurred at the Defendant's home on August 11, 2009. The victim said that the church youth group was watching a movie together in the living room, and he and the Defendant were seated on the couch. The victim explained that he and the Defendant were under a blanket to hide their physical contact from the other youth

group members in the room. The victim and the Defendant masturbated one another while simultaneously sending text messages. Sergeant Anderson said that, during the course of his investigation, he confirmed the occurrence of these text messages. Sergeant Anderson said that the victim told him that sexual contact occurred between he and the Defendant on "two or three other occasions" at the Defendant's house between June and August 2009.

Sergeant Anderson testified that he also interviewed the victim's parents, who said they allowed their son to attend these functions because of the Defendant's position as a leader in the church group. It was their understanding that these activities were through the church and so they allowed the Defendant "authority" over their child.

Sergeant Anderson testified that he interviewed the Defendant, and he agreed that she was "cooperative" during the interview. Sergeant Anderson said that the Defendant was initially reluctant to admit her sexual contact with a minor child but eventually admitted to her conduct. Sergeant Anderson said that it was his observation that the Defendant's sexual contact with the minor "weigh[ed] on her" and "bothered her."

Sergeant Anderson testified that the Defendant told him that she worked with a group of seventh-grade girls through the middle school student ministry. She explained that she supervised camps, retreats, weekends, and "get-togethers" and communicated with the girls regularly. She told Sergeant Anderson that it was "not uncommon" for her to communicate with her youth group members through text messaging. The Defendant said that, even though it was a girls group, often times boys would attend and participate in the activities. The Defendant said that she and her husband at the time would provide rides for some of the girls and boys to these group events. The Defendant acknowledged that she had driven the victim to and from some of the group events and that the victim's parents allowed her to do so because of her role as a leader. The Defendant said that the victim initiated the text messages with her, disclosing "some intimate personal feelings" that he felt for her. The Defendant said that the victim requested nude pictures of the Defendant and that, eventually, she "relented."

Sergeant Anderson said that there was a fifteen year age difference between the victim and the Defendant. The Defendant told Sergeant Anderson that, in June, during a movie night, the victim attempted to fondle her breast. She said that she initially stopped him but then she "relented." Initially, the Defendant denied that any sexual conduct had occurred in her home but then admitted to sexual contact with the victim during one of the movie nights at her home. The Defendant disclosed that she and the victim had engaged in fondling, genital manipulation, skin-to-skin contact, and masturbation. The Defendant said that other children were in the room and, specifically, that another girl was sitting on the same couch with them. The Defendant explained that the other children in the room were unaware of the

4

sexual contact because their movements were hidden by a blanket that was laid across their waist area. The Defendant admitting taking pictures of herself both nude and in undergarments and sending them to the victim. She said that there was "a lot" of sexual communication through text messaging that included "graphic sexual conversations, stories, [and] sexual fantasies."

Sergeant Anderson testified that the Defendant told him about a previous event, in which a parent complained of the Defendant's text message communication with their son, who, she said, was working through some personal problems. A church pastor asked her to "stop engaging in that behavior," and the Defendant said that she "stopped talking with boys late at night after that request."

On cross-examination, Sergeant Anderson agreed that the Defendant was "cooperative" during the entire investigation. Sergeant Anderson said that, in his review of the Defendant's messages, he only focused on communication between the Defendant and the victim, but he had no reason to believe that her conduct occurred outside the incidents with the victim. Sergeant Anderson said that, other than the contact with the victim, the Defendant denied any other sexual contact with persons under the age of eighteen.

Stephanie Cisco, a Franklin Police Department officer, identified the report for the forensic exam conducted on the Defendant's family computer. Over 33,000 text messages were recovered from the computer, not all of which involved the victim. Detective Cisco testified that text messaging between the Defendant and the victim began on July 17, 2009. Three days later, on July 20, the content of the text messages became sexual. Cisco read several of the text messages aloud, noting that the Defendant's text messages were "very descriptive" sexual narratives while the victim responded with one-word messages. Four sheets of thumbnail photographs, sent by the Defendant to the victim, of the Defendant in various stages of undress were entered into evidence. On July 22, 2009, another set of text messages were exchanged containing sexual content. On July 23, text messages about a "sexual fantasy" that involved girls from the Defendant's church youth group were exchanged between the Defendant and the victim. Detective Cisco said that "on more than one occasion" there was a reference to the Defendant teaching the victim "things" of a sexual nature. Detective Cisco said that text messages were exchanged daily, some of which were "normal conversation, but most of it was sexual."

Charles Barrineau, The People's Church Middle School Ministries pastor, testified that the Defendant was one of his adult volunteers in the middle school ministry. Pastor Barrineau explained that adult volunteers help oversee and lead in different aspects of the student ministry. Pastor Barrineau said that, in preparing volunteers to work with small groups, he provided them a "small leader tool kit." The kit contained a page titled "Two

things every small group leader needs to remember." The first was, "You are the authority." Pastor Barrineau recounted several occasions in which he had to "caution" the Defendant about her behavior. Pastor Barrineau learned, after one outing, that the Defendant had gone to the movies with some students. Pastor Barrineau reminded the Defendant that he needed to be aware of any group outings or events. The Defendant responded that it was not a church activity and just "a group of kids going to the movies." Pastor Barrineau explained to the Defendant that, because she is a leader when she spends time with the students, it is part of the ministry.

Pastor Barrineau testified that, on another occasion, a mother of one of the male students told Pastor Barrineau that the Defendant was driving her son home in the evenings. One of the volunteer guidelines is that female leaders are not to spend time alone with male students. Pastor Barrineau spoke with the Defendant about the complaint, and she explained that she was never in the car alone with the boy student because another girl student was always present. The same mother was also concerned because she observed text messages sent from the Defendant after midnight to her son's cellular phone. Pastor Barrineau spoke to the Defendant about the text messages, and she explained that she did not initiate the contact but responded to a text message from the student. Pastor Barrineau told the Defendant that there should be no contact with students after "appropriate hours." On another occasion, a parent was concerned that an "older woman," the Defendant, showed up at her house with some middle school girls to "hang out" with middle school boys.

Pastor Barrineau explained that he had a policy for swimming activities that boys wear swim trunks and girls wear one-piece bathing suits. At one swimming function, the Defendant wore a two-piece swimsuit. After a parent mentioned that it was inappropriate, the Defendant put on a t-shirt, but the pastor was later notified of this incident.

Pastor Barrineau testified that he had spoken with the girls in the Defendant's small group and described some of the girls as "[v]ery upset as a result of understanding all the things that had been going on that they weren't aware of." Some of the girls realized that their relationship with the Defendant had become inappropriate, in that the Defendant became more of a friend than a leader in the group.

The Defendant testified that her ex-husband's pornography addiction placed a strain on their marital relationship. After her ex-husband filed for divorce, she sought counseling with Diane Marshall for issues related to these offenses and family counseling. The Defendant said that, with the help of the counseling sessions, she believed she was more emotionally stable than she was at the time she committed these offenses. Additionally, the Defendant elected to seek sex offender therapy with Dr. Moore. The Defendant believed that this counseling was also beneficial. The Defendant stated that she took responsibility for her

6

actions, and she believed she would not re-offend.

The Defendant testified that she had three children: a ten-year old daughter, of whom she had primary custody, and two sons, with whom she had visitation rights. In addition to caring for her children, the Defendant also helped care for her mother, who had suffered multiple strokes beginning in 2003.

The Defendant testified that she understood the rules of probation and was prepared to comply with those rules. She said that she sought a variance for the rule prohibiting internet access, in order to finish a Business degree.

On cross-examination, the Defendant testified that she did not have a letter from her current therapist, Dr. Moore, about her current progress in therapy. The Defendant acknowledged that Dr. Moore indicated in the Defendant's psycho-sexual evaluation that the Defendant was "responding on the test in an attempt to fake good. This means she was trying to give the appearance of being in control, adequate, and effective. She lacks insight and understanding." The evaluation further reflected that the Defendant is "at risk for sexual re-offense, although [her] risk is low; [she is] in denial of [her] choices and responsibility for [her] actions, although [she] admitted some factual details of [her] behavior."

The Defendant testified that she was hired to do accounting for American Home Patient but was recently terminated due to these offenses. The Defendant admitted that she was alone in her car with boys even though she told Pastor Barrineau the contrary. The Defendant agreed that the text messages with sexual content reflected that she was the one providing the narration, the specific sexual acts, and fantasies. The Defendant agreed that she was an "active participant" in the physical contact that occurred between her and the victim. Regarding her conduct, the Defendant stated, "I think it's terrible and should never have happened, I hate that I did it, I hate that I didn't have the control, and I hate that I didn't put an end to it."

The Defendant admitted the use of marijuana and ecstacy while she was in high school. The Defendant stated that she recently married a man who had two minor children, ages seven and nine. When asked if the children's mother was aware of the Defendant's convictions, she stated, "I don't know."

Diane Marshall, a Tennessee licensed marriage and family therapist, testified that she first met with the Defendant in August 2009, after the Defendant had been accused of these crimes and been served with divorce papers. Marshall said she treated the Defendant for eighteen months until Dr. Moore "demanded" that the Defendant cease therapy with Marshall. Marshall described the Defendant as "developmentally delayed" when she first

7

entered therapy, so Marshall worked to "emotionally mature [the Defendant] to her chronological age." Marshall said that the Defendant's relationship with her husband caused her to have a lack of sense of self. Marshall said that the Defendant felt "great shame" and "remorse" about her conduct. Marshall testified that she had seen progress with the Defendant, and she did not believe the Defendant would re-offend.

The victim's mother testified that, before these incidents, her son was "fairly outgoing," played sports, was active in school, and was active in church. During the time period in which these events occurred, the victim became more quiet, missed school more often, and his grades dropped. During the course of the investigation, the police recommended a therapist to the victim's family. Initially, the victim and his family were treated separately and then treated as a whole. The victim's mother said that the victim wrestled with feelings of embarrassment, anger, and shame. After the completion of the counseling, she had noticed that the victim had begun interacting with his friends again and participating at church.

After hearing the evidence, the trial court sentenced the Defendant as a Range I, standard offender. Counts I and II, sexual battery by an authority figure, and Counts IV and V, sexual battery by an authority figure, were merged, and the trial court imposed a five-year sentence. The court ordered the Defendant to serve six months of incarceration, followed by supervised probation. Likewise, the trial court merged Counts III and VI, aggravated statutory rape, and imposed a four-year sentence, suspended to supervised probation after six months confinement. For Count VII, exploitation of a minor by electronic means, and Count VIII, solicitation to commit aggravated statutory rape, the trial court imposed a two-year sentence, of which six months was to be served in confinement and the remainder was to be served on probation. For Count IX, solicitation to commit sexual battery by an authority figure, the trial court imposed a four-year sentence, suspended to supervised probation after six months confinement. The trial court ordered that all sentences be served concurrently for a total effective sentence of five years, six months of which was to be served in confinement and the remainder of which was to be served on supervised probation. It is from these judgments that the Defendant appeals.

## II. Analysis

We first note that the Defendant failed to include a transcript of the guilty plea submission hearing. It is the defendant's duty to compile a complete record for appeal. Tenn. R. App. P. 24(b). A recent panel of this Court held that the guilty plea hearing transcript is vital to a *de novo* review of sentencing and, in the absence of an adequate record, we will presume the trial court's ruling were supported by sufficient evidence. *See State v. Christine Caudle*, No. M2010-01172-CCA-R3-CD, 2011 WL 6152286 (Tenn. Crim. App.,

8

at Nashville, Dec. 8, 2011) *perm. to app. granted* (Tenn. April 12, 2012*).* Another panel of this Court, however, concluded that, despite the absence of the guilty plea submission hearing transcript, the record was adequate to afford appellate review. *State v. Anna M. Steward*, No. E2010-01918-CCA-R3-CD, 2011 WL 4346659 at *5 (Tenn. Crim. App., at Knoxville, Sept. 19, 2011), *no Tenn. R. App. P. 11 application filed*. Based upon the specific facts of this case, we conclude that the record is sufficient to afford appellate review.

On appeal, the Defendant argues that the trial court erred when it: (1) applied certain enhancement factors and failed to apply other mitigating factors; (2) denied her a sentence of full probation; and (3) denied the Defendant's variance request for internet access. The State responds that the record fully supports the sentence in this case, and, therefore, the Defendant is not entitled to relief.

When a defendant challenges the length, range or manner of service of a sentence, this Court must conduct a *de novo* review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2010). As the Sentencing Commission Comments to this section note, the burden is on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401 (2010), Sentencing Comm'n Cmts. This means that, if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the 1989 Sentencing Act, Tennessee Code Annotated section 40-35-103, we may not disturb the sentence even if a different result was preferred. *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In conducting a *de novo* review of a sentence, we must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing, (4) the arguments of counsel relative to sentencing alternatives, (5) the nature and characteristics of the offense, (6) any mitigating or enhancement factors, (7) any statements made by the defendant on his or her own behalf and (8) the defendant's potential or lack of potential for rehabilitation or treatment. *See* T.C.A. § 40-35-210 (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

## A. Application of Enhancement and Mitigating Factors

The Defendant argues that the trial court should not have considered her "limited drug

use some ten years plus prior" to enhance her sentence. The Defendant also argues that the trial court erred "in not applying mitigating factors" and, specifically, its finding that mitigating factor (1), that her conduct did not cause or threaten serious bodily injury, was inapplicable. The State responds that the trial court's findings of fact are adequately supported by the record. We agree with the State.

The trial court made the following findings as to enhancement factor (1):

[E]nhancement factor[ ]: (1) applies; "The Defendant does have a previous history of some criminal behavior, in addition to those necessary to establish the appropriate range." That criminal behavior I don't think needs to be anything other than some limited drug use at a very young age. Obviously that enhancement factor really had no true bearing on the Court's decision.

Although the trial court acknowledged the Defendant's drug use in high school, this criminal behavior had "no true bearing on the Court's decision." Even so, the use of marijuana and ecstasy is a criminal act, whether committed in high school or later, thus, it was properly considered by the trial court.

As to the mitigating factors, the trial court declined to apply mitigating factor (1), that the criminal conduct neither caused nor threatened serious bodily injury. T.C.A. 40-35-113(1) (2010). The trial court stated, "the Court believes it did cause mental harm to the child, and I don't believe that it's appropriate to use as a mitigating factor here." The trial court then found applicable mitigating factor (11), the defendant committed the offense "under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct." T.C.A. 40-35-113(11) (2010). The trial court also considered that the Defendant had no prior criminal history, sought counseling, had family support, and that the nature of the sexual conduct was limited and did not include oral sex or intercourse.

The Defendant's broad complaint that the trial court "erred in not applying mitigating factors" is unfounded. Although the trial court chose not to apply mitigating factor (1), the trial court did consider and apply other factors in determining the Defendant's sentence. As to the Defendant's specific complaint that the trial court did not apply mitigating factor (1), we conclude that the trial court's decision is supported by the record.

Tennessee Code Annotated section 39-11-106(a)(34) defines "serious bodily injury" to include substantial impairment of a mental faculty. This Court has held that "[p]sychological problems can constitute serious bodily injury." *State v. William Marvin Brown*, No. M2001-02287-CCA-R3-CD, 2002 WL 31852853, at *7 (Tenn. Crim. App., at

10

Nashville, Dec. 18, 2002) *perm. app. denied* (Tenn. April 28, 2003) (citing *State v. Smith*, 910 S.W.2d 457, 461 (Tenn. Crim. App. 1995)). This Court has further held that "every sexual offense is physically and mentally injurious to the victim." *State v. Johnny Shields*, No. W2001-01554-CCA-R3-CD, 2002 WL 927606, at *4 (Tenn. Crim. App., at Jackson, May 3, 2002) *no Tenn. R. App. P. 11 application filed* (citing *State v. Kissinger*, 922 S.W.2d 482, 487 (Tenn. 1996)).

As a result of the victim's inappropriate interactions with the Defendant, his behavior changed, his grades dropped, and he experienced embarrassment, anger, and shame. The victim sought counseling, individually and with his family, for a period of six months. Thus, we conclude that the trial court's refusal to apply mitigating factor (1) in this case was proper.

Accordingly, we conclude that the trial court properly considered sentencing factors and principles in determining the Defendant's sentences for these offenses. The Defendant is not entitled to relief.

## B. Full Probation

The Defendant contends that the trial court erred when it ordered her to serve part of her sentence in confinement. The State responds that the trial court sentenced the Defendant within the applicable range and properly exercised its discretionary authority. We agree with the State.

At the conclusion of the sentencing hearing, the trial court stated that its primary concern was the seriousness of the offenses and the importance of not degrading the seriousness of the Defendant's conduct. In considering the nature and circumstances of the Defendant's crimes, the trial court noted that it was troubled that this occurred while the Defendant was acting as a church leader and concerned for the impact on the victim of this interaction through a church setting. The trial court further noted that the text messages sent to the victim from the Defendant were "specifically designed so that this young man would continue. . . his interest. [The Defendant] knew what she was doing every step of the way, she underst[oo]d the nature of her actions, and she used her knowledge and the young man's youth to get, ultimately, his attention." In considering sentencing for this case, the trial court stated the following:

> [The Defendant] obviously ha[s]n't had criminal trouble before, I've got three reports saying [the Defendant's] risk of any re-offense is low, I've got your [in] counsel[ing], I've got the psychosexual that's been put on the Pre-sentence Report saying your risk is low, and the investigator who prepared the report, their own little probation charts, they rank your status as low. So

11

I've got someone that shouldn't re-offend, I've got someone that hasn't a criminal history before, and then I've got a very unique set of circumstances which the Court, I think, I hope has made clear that I don't think would be repeated. I've got to balance that against, basically, the harm that's been committed here, and there's been a significant harm, and then I've also got to balance that against what the community needs to recognize as the norms. Again, I'm not lecturing you here, but you're clearly outside those norms, and you and I both know that. And that can't be solved just simply by a probated sentence.

Finding full probation inappropriate in this case, the trial court ordered the Defendant to serve six months in confinement with the remainder of her sentence to be served on probation.

To meet the burden of establishing suitability for full probation, a defendant must demonstrate that full probation will subserve the ends of justice and the best interests of both the public and the defendant. *State v. Blackhurst*, 70 S.W.3d 88, 97 (Tenn. 2001). The following criteria, while not controlling the discretion of the sentencing court, shall be accorded weight when deciding the defendant's suitability for full probation: (1) the nature and circumstances of the criminal conduct involved; (2) the defendant's potential or lack of potential for rehabilitation; (3) whether a sentence of full probation would unduly depreciate the seriousness of the offense; and (4) whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes. T.C.A. §§ 40-35-103(1)(B), -103(5), -210(b)(4) (2010); *see also Blackhurst*, 70 S.W.3d at 97.

In the case under submission, the Defendant is eligible for full probation because her sentence is ten years or less (subject to certain statutory exclusions not relevant here). T.C.A. § 40-35-303(a) (2010). Although full probation must be automatically considered by the trial court as a sentencing alternative whenever the defendant is eligible, "the defendant is not automatically entitled to probation as a matter of law." T.C.A. § 40-35-303(b) (2010), Sentencing Comm'n Cmts.

The trial court ordered the Defendant to serve six months of her five-year sentence in confinement with the balance to be served on supervised probation. The trial court properly considered the presentence report, the facts and circumstances surrounding the offense, the Defendant's amenability to probation, society's interest, and the need for deterrence when it denied full probation.

The Defendant, acting as a church leader to middle school girls, engaged in a relationship with the victim which quickly turned sexual within three days of their first text

message exchange. The Defendant's text messages were lengthy, descriptive, and graphic as to the sexual encounters in which she wished to engage in with the victim. One of the sexual fantasies she created involved not only the victim but other girls in her youth group. Even after admonishments from her supervising pastor, she continued to blur boundaries and act inappropriately in her role as a church leader. She further engaged in sexual contact with the victim in the same room with other youth group members, under the guise of a "church activity." Her conduct not only negatively affected the victim and his family but was harmful to the girls in her youth group who later learned of her conduct. The evidence does not preponderate against the trial court's finding that the nature and characteristics of the criminal conduct warranted a sentence that included some confinement. *See* T.C.A. § 40-35-210(b)(4) (2010).

Thus, because the Defendant has failed to demonstrate that full probation will subserve the ends of justice and the best interests of both the public and herself, we conclude the trial court properly denied the Defendant full probation, ordering her to serve six months of the five-year sentence in confinement and the remainder on probation. *See Blackhurst*, 70 S.W.3d at 97. The Defendant is not entitled to relief on this issue.

### C. Denial of Variance Request

The Defendant argues that the trial court improperly denied her variance request for access to the internet. The State responds that the Defendant's history of using electronic media to commit her sexual offenses with the minor victim warrant the trial court's denial. We agree with the State.

Internet access is prohibited under the specialized probation conditions for sex offenders unless waived by the court. Due to the nature of the Defendant's offenses, she is a sex offender and subject to these probation conditions. The Defendant requested the trial court waive the condition prohibiting internet access, in order to continue pursuit of a college degree. The trial court denied her request, stating:

> The Court, because this is such a unique situation, did consider a variance request at least for access to the internet over that time period. Obviously the internet's a way of life; however, I will say that based upon the psychosexual, it appears like the Defendant has experimented to some degree with sexual activity on the internet, one of the specific concerns that Ms. Moore had was the internet, so the Court is not going to grant a variance as to that.

Our review of the psycho-sexual history reveals that the Defendant admitted using the internet for sexual talk and met "one partner on Facebook." Although not through the

13

internet, the record bears out that the Defendant used electronic technology in the furtherance of her crimes. In Dr. Moore's report on the psycho-sexual evaluation, she recommended that the Defendant's "internet computer use be monitored. These restrictions should also apply to any electronic devices such as a cellular telephone, iPhone, and Xbox." She also made the recommendation that the Defendant not "participate in internet sexual behavior such as chatting online with others, including those who may be underage, viewing sexual images, communicating via myspace or facebook accounts, using social networking sites, or using a web camera."

Accordingly, the record supports the trial court's denial of the Defendant's request for a waiver of the condition of probation prohibiting internet access. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE